We'll hear argument first this morning in Case 1771, Weyerhaeuser Company v. United States Fish and Wildlife Service. Mr. Bishop. Mr. Chief Justice, and may it please the Court, Congress amended the Endangered Species Act in 1978 to narrow the concept of critical habitat. And it did that in response to this Court's decision in Hill and an early regulation that allowed critical habitat designation for population expansion beyond a species present habitat. In the provision that requires designation of critical habitat, Section 4, Congress limited the service's power to designate to any habitat of such species which is then considered to be critical habitat. In Section 3.5c, Congress commanded that critical habitat shall not include the entire area which can be occupied by a species. And those limitations show that Congress intended that areas that can be occupied by a species, that is, its habitat, mark the outer bounds, the outer bounds of critical habitat, and it would be perverse. Mr. Bishop, may I offer you a hypothetical just to understand the scope of your argument, which is a bit unclear to me. So in my hypothetical, there's a species which, like this one, is in only a single habitat. And for whatever reason, that habitat is no longer going to support the species. Disease has come, a predator has come, it's gotten too hot, it's gotten too cold, whatever it is, that single habitat no longer will be able to support the species. And there is no habitat that at the present moment, there is no other habitat that at the present moment is capable of conserving the species over the long term. But there is a habitat that with only slight improvements, what the government calls reasonable efforts, can support the species. Okay? So Habitat A, where the species is, no longer any good. Habitat B, it can't, it won't conserve the species if left just as it is, but it only takes reasonable effort to conserve the species. Can the government designate that area as unoccupied critical habitat? No. It has to be habitat. Now, just to be plain, part of the problem with that is that the government, when the government talks about reasonable changes, which is what it does here, what would be involved on this piece of land? I understand that you think that it's much more than reasonable changes that would be involved here. But in my hypothetical, that's why it's a hypothetical. I understand. I'm stipulating. I understand. That it's pretty minimal stuff. It's, you know, dig a few holes, plant a few trees, that sort of thing. I don't rule out that the government might be able to justify a critical habitat designation when there are de minimis changes, where you're really only talking about digging a few holes, where there is a very minimal change required in the land. That isn't this case. We haven't seen the government's justification for doing that. What happens when you have a reasonable... I want to stick to my hypothetical, which is, you know, maybe something more than de minimis, but what the government views as reasonable changes such to allow the land to support the species over the long term. No, we don't think so, Justice Kagan. And why is that? Where in the statute do you find that? The statute says it in three places. It says in Section 4 that only habitat of such species can be designated as critical habitat. But we know that habitat doesn't mean, excuse me, I'm sorry. We know that habitat doesn't mean just where a species lives. I mean, that would be the common understanding of the word habitat. But this statute clearly goes beyond that. And we know because it says it's also where a species could live, right? There are also habitats that are outside the geographical area occupied by the species. So we know that the statute is not using the kind of garden variety definition of habitat. No, I disagree with that, Justice Kagan. 3.5c says that critical habitat cannot be designated beyond the entire area which can be occupied. Congress was thinking about habitat in the sense that it is used in common speech and in the dictionaries, which is a can-be-occupied sense. Let me give you an example. The 1979 Convention on Migratory Species, to which we are signatory, says it's an area which contains suitable living conditions. The Forest Service contemporaneously with these amendments in 1978 said that it's the environment where all the essentials for species development and existence are present. But if you use the migratory bird example, then we have here the ephemeral frog ponds, which are supposed to be ideal for breeding. So it's a habitat that is suitable for breeding. I disagree with that, Justice Ginsburg. It's incorrect to label that as habitat, because the frog spends only less than a month in breeding ponds. For this to be a habitat, it has to be land which can be occupied. The habitat here includes, and this is listed. Ginsburg. Is it true in the case of birds that they may stay in a place less than a month? That's an entirely different example, Justice Ginsburg. The habitat for a migratory bird includes a summer habitat, a winter habitat, and the places along the way where it has to, where it roosts. It may prefer particular trees. You have a contiguous habitat, and the roosting trees clearly can be listed as critical habitat if they meet the other conditions. If I could go back to the statutory basis for your position, because to my mind, it is a counterintuitive result that the statute would prefer extinction of the species to the designation of an area which requires only certain reasonable improvements in order to support the species. That seems a counterintuitive result, and as I say, it does not seem a result that's in the language, which contemplates that habitats will exist even beyond the areas where a species currently resides. Justice Kagan, there is a difference between an area, an unoccupied area that is habitat and an unoccupied area that is not habitat. Mr. Bishop, can you repeat that? I'm sorry. Continue. The statute reaches only in 3.5c, critical habitat shall not include the entire area which can be occupied. That is the limit that Congress said. But I think that that was dealing with a very different problem. That was dealing with a problem where a species can reside in many areas outside of the area where it resided, and the statute was making clear that just because that's true, you can't go designate all of those areas habitat. But this is a different problem from the problem that we're talking about, where there's only a single area that might conceivably prevent extinction of the species. And you're saying that notwithstanding that it was – it's only reasonable efforts that would allow it to conserve the species, that's not permitted. It is not. And there are clear statutory indications. Well, do you – Mr. Bishop, do you agree with the proposition that the choice in Justice Kagan's hypothetical is between designation of the land as critical habitat and extinction of the species? Are there not other options available to the Federal Government? There are other options, and there are other clues in the statutory language. Apart from Section 4 and 3.5c, what this Court said in Sweet Home was that the Section 5 purchase authority was well suited for buying land that is not yet but may in the future become habitat. That was this Court's decision in Sweet Home. In addition, I will point out the definition of conservation in Section 3.3, which you would think if Congress had in mind that restoration and creation of new habitat, which is what would be required on this land, that that would be known out. If that was what it had in mind, it would have used one of those terms. But the list in 3.3 talks about maintenance of habitat and translocation. It does not talk about the creation of new habitat or the restoration of habitat back to the period before human intervention. But I guess what strikes me about the statute, Mr. Bishop, is that really all over the place you get these references to the fact that habitat isn't just sort of there and perfect always. That habitat requires things to be done to it. You know, even in the definition of occupied critical habitat, it talks about  habitat. And similarly, in the definition of conservation, it talks about, you know, the need for habitat improvement. So all through the statute, there's this idea of it's not just an on-off switch, that there is habitat that needs to be maintained, improved, and so forth in order to fulfill the function of preserving a species. With all due respect, Justice Kagan, I don't think that's right. I think that all of those references to habitat are references to maintaining habitat that already exists. And I guess you were preliminary question and concerns with the landowner's claim is currently right. That is, you are not commanded to do anything. You don't have to do anything at all to conserve the endangered species. And you can continue the, what is it, timber farming that's going on. Now, it may be that down the road you will want to do something else with the land, but wouldn't that be the appropriate time to seek exclusion? No, Justice Ginsburg. The immediate effect of this overlay of a critical habitat on this 1,500 acres is a diminution in value of tens of millions of dollars. That is what it says in the agency's economic analysis, that there is an immediate loss in value. And the reason, I think, for that is fairly easy to see. Any buyer coming in will recognize that down the road they have to deal with the critical habitat designation. We have ourselves spent hundreds of thousands of dollars completely planning out and obtaining a rezoning of this land for development. Those are wasted expenditures at this point. That was done before the critical habitat designation. We would have to go back. We would have to revisit those, obtain changes in the zoning, and change our plans. But the critical point here is that the agency itself found that there was an immediate loss of value to our land. This is our land that has been designated. We are the object, to use Lujan's terms, we are the object of this designation and it has caused us immediate financial losses, both sunk costs that we already have and changes in order to be able to proceed. Sotomayor, this is a royal we. As I understand it, the only appellant before us is yours who is the lessee of the acres. So it wasn't the lessee of the timber cutting. It was the separate owner of the land who has incurred these expenses. And that's not an appellant before us, is it? We incurred all of these expenses. As the economic analysis explains, the agreement between Weyerhaeuser, the agreement between Weyerhaeuser and the owners of the rest of the property is that we would expend the money and they would provide the land. We also own 150 acres. We provided all of the money for the development and we own 150 acres that have been designated that have immediately lost value as a result of this. Can I go back to a question? As I was reading the evidence in this case, it appeared that there was a dispute as to whether this frog could in fact survive, maybe not as healthily as it does now, and maybe not for the very long term. But there was evidence that the frog was there for I think 10 or 15 years while timber cutting was occurring. There was some scientific evidence that there were stumps that the frog might be able to survive in as opposed to the canopy forest. I know that the Fifth Circuit said that there was no dispute this wasn't currently habitable, but I think that depended on what definition you gave to habitable. If we give a different definition, what would be the minimum if it didn't include the PCEs that you think are necessary? Because I don't know that unoccupied has to be an optimal survival place, and if it doesn't have to be optimal, what would otherwise be a minimum? This property is not just not optimal, it is not habitable. And this is only the litigating position of the Department of Justice. The judges below who looked at the Fifth Circuit judges, including the majority, not just the dissenters, who looked at the administrative record here, which is what this Court is reviewing, not the litigating position of the Department of Justice, concluded, and this is from the majority, that the service had found that this was unit 1 was currently uninhabitable. That's page 24A of the petition appendix. And just to ---- But that definition was never provided. The definition that we provided was the definition that we have provided to this Court, which is the dictionary definition from Webster's third, the physical features that naturally or normally are preferred by the species, the 1979 convention, land which contains suitable living conditions. And, you know, a picture is worth 1,000 words. In the joint appendix on page 57, there is a photo, albeit a small one, of the land of adult frogs upland habitat. And it's a picture of a few trees with a grassland savanna. And the scientific experts that you refer to, Justice Sotomayor, for example, Lanoue, talk about the habitat that's needed on the uplands as a savanna. I think it's begging the question, which is, I don't know that the circuit below actually accepted your definition or whether your definition, for the reasons I indicated just a few minutes ago, covered all of the conditions that could make for survival for this species. As I read the record, there were suggestions by some of the scientists that would make what you admitted to Justice Kagan a little while ago minimal work. This species could survive, I'll bet not robustly, but it could survive. Wouldn't that be enough? No. No. That's just not what the administrative record shows. All right. Well, I don't want to argue the record now. The question is, if I come away, having reviewed it, with a question about whether the circuit actually addressed that question and defined what it thought the minimal requirements for habitat were, wouldn't the answer be to remand this case and let it make that determination? If you thought that habitat meant something other than what the convention says and what the dictionary in 1978 said, and if you think that on the basis of this record that this is habitat for the species, then I think that will be... We'll let your adversary... None of those things are supported. None of those things are supported by... Assuming what I said. Yes. Would a remand be appropriate? Yes. Okay. I'd like to ask you. I've not... One way of looking at the case, as I started looking at it, is this isn't about words, really, or definitions. Every time the word habitat is used, or almost every time they talk about critical habitat, which is a defined term. But the key words that follow it are typically essential or necessary. So, something like that. So, in thinking about it, I thought, well, air is necessary. We're going to be in real trouble without it. But it's not the only thing that's necessary. Water is necessary, too. So, you could have, for mammals, situations where they need air and they can't be submerged in a swamp. So, this land will have the air, but it's a big swamp. But maybe we'll drain it. So, if we drain it, it's going to be fine. And if that's what the statute basically means, you get the idea where I'm driving, then this is a typical agency case. Because, after all, if you can't drain the swamp, then the air is irrelevant. But if you could drain the swamp pretty easily, well, then the air is essential, and you better be sure you have it. Now, on that, the agency has found, well, it's not that hard to drain the swamp. Good chance we'll do it. Good chance we'll do it. You say, ha, they don't know what they're, well, I mean, you're polite about it. And so, you don't, isn't what we have to do? We look at the record. It's, the discretion is given to the secretary. That's a lot. And we say, did they, in this case, the secretary, exceed the discretion that the statute gives him in thinking they could drain the swamp, i.e., they could make a canopy? Good chance it'll happen. Period. Typical agency case. Now, is that how I should look at it? No, not at all. The administrative record here shows that this land would have to be totally remade. It would have to be made to look something like that picture on JA-77. And that burden is not something that is allowed by language, plain language in the statute that requires that the land be habitatted. Oh, we're looking at it the same way. You just want me to come out differently. I would like to spend a couple of minutes, if I may, on judicial review. The court below held that the exclusion decision here is not subject to judicial review. It was correct. The statutory language of the exclusion decision here, Section 4B-2, is that the agency may exclude any area from designation if the secretary determines that the benefits of exclusion outweigh the benefits of inclusion. So it's not a may statement from Congress. It's a may if. May exclude if these other conditions are met. It weighs the benefits of exclusion against the benefits of inclusion. Well, it is a may if, but if the other conditions are met, it indicates, because of the use of the may rather than the use of a shall, doesn't it, that the secretary still has discretion? In other words, if the conditions aren't met, then the secretary can't exclude. But if the conditions are met, the secretary may exclude. If he wants. Yes. Ultimately, it's a discretionary decision. I think the question is whether State Farm review of that if clause is appropriate. And this Court has already decided that question in Bennett, a unanimous decision of this Court, where it considered both parts of that B-2 provision. And the Court said it is rudimentary that discretion as to the substance of the ultimate decision making. And the government itself has conceded this. If I'm. Sorry. No, not at all. Maybe you can help me out with this. Let's suppose for now that I would agree with you and that we could review this. What more would you expect the secretary to say or could say, given the state of scientific evidence before the secretary? That's not clear to me. The secretary says there's just not any evidence of the benefits of exclusion that I can put a number on. And isn't the way the statute's written, put some burden of proof incumbent upon the landowner or lessee to come forward with something quantifying the benefits of exclusion? Right. Well, certainly it's permissible for the agency to characterize the benefits of inclusion as being biological, which is something that can be described but not quantified. But on the other side of that ledger, the agency has to meet state farm standards in identifying what the facts. On that, my question is what more would you ask the secretary to do? The secretary did quantify the economic benefits of exclusion and then said compared to the benefits of inclusion, they're indeterminate. And therefore, the burden of approving exclusion has not been met. And that burden, it seems to me, rests with you. So suppose there's some judicial review possible here. Do we need to get into how many angels dance on the head of that pin if you've got no real complaint at the end of the day with the adequacy of the secretary's statement? Well, we do have that complaint. And certainly a remand would allow us to explore that. But, you know, on the state farm, the inputs. Could you explain that to me? Yes. The inputs into the decision have to be fair and reasonable. And the connection between those inputs and the ultimate decision have to be. Let me give an example of a very basic error, an example of an internal inconsistency. So the service refused to factor in the loss of Unit 1 to housing and to St. Tammany's tax base. And it did that because it found that Unit 1 is only 0.5 percent of developable land in the parish. There's a big problem with that. It included as developable land everything south of Interstate 12, which is not developable because it flooded in Hurricane Katrina. Everyone from that area is moving up to us, to the higher ground. It said, in addition, it acknowledged that Unit 1 is particularly attractive for development because Highway 36 runs through it. It's an attractive area for development because it's connected to centers where the jobs are. And yet, so we have a Unit 1 that is already zoned, it's outside the flood zone, and it's well served by roads connecting it to jobs. But the service treated every undeveloped area in the parish as fungible and said, this just isn't an important development area. Even though St. Tammany, as its brief explains in this case, says, no, it's a very important development area. That is what you get when there's no judicial review, when an agency thinks that there are no controls over what it concludes. And the economic analysis is riven through with very basic errors of that kind. And I submit that without the possibility of judicial review in cases like this, that is what you get, a very unsatisfactory balancing. And that is what State Farm is for. State Farm is there to ensure that when a balancing like this has to be done, when there are multiple factors to be considered, that the agency gets it fairly right as to what those factors are, and then connects up the dots between what those factors are and what its ultimate conclusion is. Not the one-line, unexplained conclusion that it had here that it was not going to exclude. If I can save the rest of my time for rebuttal, please. Roberts. Thank you, Mr. Bishop. Mr. Kneedler. Mr. Chief Justice, excuse me. Mr. Chief Justice, and may it please the Court. The dusky gopher frog is a critically endangered species. It is at serious risk of extinction. As the Fish and Wildlife Service found, if the frog is to be conserved and the risk of its extinction reduced, the area involved here is essential to accomplish those explicit statutory purposes. It therefore was properly designated as unoccupied critical habitat. Petitioner does not. It has to be. Your argument is that critical habitat doesn't have to include all of the elements for habitability because you could undertake some restoration that would provide whatever is missing, the draining of the swamp. But, you know, if you have the ephemeral ponds in Alaska, you could build a giant greenhouse and plant the longleaf pines and the frog could live there. In other words, there has to be presumably some limit on what restoration you would say is required. Yes, and what the service found here is that restoration of the uplands could be accomplished with reasonable efforts. The central feature of the habitat Well, reasonable efforts that the landowners would have to undertake voluntarily, right? The landowners, or if they entered into an agreement with a conservation group, the Nature Conservancy has purchased land at the other location where the frog is. Well, they've told you they're not going to do it. That's true, but the operation of the Act, it can't be dispositive of what the subjective intentions at this moment in time by this particular owner of the property are. The Act turns on the status of the land, not the intention of the landowner. Now, that may be taken into account at some point in deciding whether the land is essential. The proposed regulation that Interior is published says that. I don't understand. I mean, you said that it can be designated as critical if some restoration can take place. And as far as where we are right now is the landowner saying we're not going to do the restoration you want. Right. So you just say, well, we're going to designate it anyway, even though the restoration won't occur? Well, the question of whether it is capable of supporting a population is basically a scientific one. Section 4B2 says that it should be based on the best scientific evidence available. It's about the status of the land. With the change, right? Can this support the population if they make this change? Yes. Well, but what's the limit? I mean, you could require, say, well, this piece of property in Canada could accommodate the species so long as you invested $100 million to put in ephemeral ponds, change the loblolly pines, the long leaf, and do all this. Well, it has to be, according to the service here, reasonable efforts. What's the definition of reasonable? Something that, I mean, for one thing, I think there's a big distinction between whether, in this case, the upland habitat has been transformed to such an extent that it's destroyed, like if there was a shopping center there or a housing development there. As compared to the upland habitat here, it has trees. Why is that so, Mr. Kneedler, though? I mean, it might be a few more dollars to pull up the asphalt and then put down the ephemeral ponds. Why would a parking lot make the difference? Why would that be an unreasonable effort, necessarily? It's conceivable if it was a small. Where does all this come from in the statute? Where do you get reasonable efforts in the statute? Well, I think it runs throughout the statute, frankly. Well, runs throughout. Can you show me where? Well, a number of places I would refer to. The definition of critical habitat, both prongs, talk about – I don't see reasonable efforts there. No, not reasonable efforts. It's not there. No, but it talks about conservation, what's essential for conservation of the species. Conservation is defined as all measures necessary to bring the species back to the point where it does not need protection of the act. Under Section 7, the government has enormous powers to help species, whether in critical habitat or elsewhere, right? There's nothing preventing the government from purchasing land or taking other actions to protect an endangered species, whether on critical habitat or elsewhere, right? But this Court said in Sweet Home, for example, that the fact that the government can purchase land or make grants does not undermine the operation. The critical habitat – It's a supplementary power, though. You'd agree. It is, but for one thing, the designation of critical habitat serves a very important function in educating and identifying the areas where the species could be used. And it's also important to recognize this is a proposition not limited to private land. It also has to do with public land. So having the expertise of the Fish and Wildlife Service identify those areas that are necessary for recovery of the species, can, for example, identify the areas that would be – that a conservation group might want to enter into an agreement with a landowner to conserve, that the State might decide to purchase. So the identification of the habitat is not just in terms of triggering Section 7 of the Act. Do you – I think your argument requires you to provide some definition of reasonable restoration. Now, this case is going to be spun – we've already heard questions along this line – as a choice between whether the dusky gopher frog is going to become extinct or not. That's not the choice at all. The question is who is going to have to pay and who should pay for the preservation of this public good. Now, it may be very difficult for a lot of people to shed tears for a big corporation like the one in this case. But let's suppose this is a family farm and part of the – the land is designated or a good part of it is designated as critical habitat. Now, to what – is there some formula, some percentage of the value of the family farm that would have to be required for this reasonable restoration before that becomes unreasonable? Can you provide any guidance on that? I don't think there would be a hard and fast rule. I think if you look at the nature of the land – I mean, for example, here, would the restoration be within the framework that the land is now being used for? It's being used to raise trees. All that would be necessary, at least at the beginning, is to thin trees. Well, yeah, but that's – no, you're right at the point. I read this. I thought it's an easy case, not the result. But the concept's easy. The statute books are filled with words like reasonable. And right here it says that the Secretary – it says a determination by the Secretary that such areas are essential. To me, that calls up is it reasonable or isn't it reasonable. It's not reasonable to say that this area is essential if the frogs will die anyway because there aren't enough trees. Okay? So let's look at the picture on page 57. And the picture on page 57 shows an area which has very few trees. And we also know that this is a logging company. And so probably they have lots of trees. They like trees. Not forever, but they want a lot of trees planted there. And so what is it in this case – and I thought the case is no more than that – what is it in this case that makes the discretion – statute books are filled with words like we give discretion to the Secretary – that makes this within and not outside that delegated discretion to the Secretary to determine essentiality? Well, I – the act, as you pointed out, it says the Secretary – It's not the act that I'm thinking of. I agree with you that it gives him lots of discretion. But the Chief Justice's first question was surely he can't require the building of hot air greenhouses in Nome, Alaska. That goes too far. And I'm not asking you to define it either. There are loads of places where it's not defined. I'm asking you to tell me what is in this record that suggests that this is within the Secretary's discretion and not outside of it. First of all, you were pointing to page 57 of the Joint Appendix, which shows the uplands at Glen Pond. There are pictures in the record at JA 17 through 20 of the area at issue here. There are trees in the background that don't show a dense canopy. I don't want to say that there is not forested land there. But I think one of the – one of the ways to look at it is would the modifications be compatible with the existing use of the land? If you're running – if you're operating a tree operation, cutting down and thinning trees is part of what you do. And it's not as if this would have to be done overnight. Well, but the problem with that is once you have the designation, you need probably federal permits to do things like logging companies typically do. And if you are asking for a federal permit, the whole point of the designation is you have to go through a fairly elaborate process. And you might not get it at the end. Well, you won't have to go through the elaborate process, and you'd probably get one if it weren't designated. Well, as far as logging is concerned, the ongoing logging operations here have not required any federal permit. It's only if the landowner wanted to transform the land and use it for development and if that interfered. Which is exactly what they want to do, right? Yes. But if that's true, then a Section 7 – excuse me, a 404 permit would be required if they were going to fill wetlands or fill the ponds. But if development happened without the need for a federal permit, Section 7 does not impose any limitation at all. It's only if there is federal involvement. But here we're talking about the basic qualification of the land to be designated in the first place. And if it — Mr. Kneedler, in your brief, you give a meaning to habitat which, frankly, is very different than its dictionary meaning. Thank you. Pages 27 to 28, you argue that habitat can include some areas where a species does not live and cannot ever live, even with restoration. That's very different than what you started your argument with today. It's very different than what you've done with the Santa Ana sucker, for example. If we disagree with you, where does that leave you in this case? Well, if you disagree about the Santa Ana sucker, that's very different. We're not looking at that. Okay. Well, let's assume I take the dictionary definition of habitat, which is the kind of place that is natural for the life and growth of an animal or plant. It's fairly simple. Natural place. Could this — is this a natural place for this frog to live? And if not, is the difference between you and your colleague whether some reasonable restoration can be made or not? That may, in the end, be the difference. But I think it's important, when you're talking about the definition that you quoted — and we quote a number of them on page 33 of our brief, a number of dictionary definitions — is it the kind of place, is it the kind of site on which the species could thrive? And here, the kind of site, I think, is really most commonly understood or defined as the central element. What makes it rare? And that's the pond. Is it the kind of place that this frog can live, is in an ephemeral pond and the immediately surrounding uplands? Was it, Mr. Kneedler? We were just told that they were in the pond for less than a month. Well, the adult frogs are, but the larvae and tadpoles remain in the pond for much longer. In fact, one of the reasons that this is rendered so rare is that you have to have an ephemeral pond with enough — with water in it for a long enough period of time, 195 days. So that the tadpoles mature and metamorphose, but not water all the time, so it has fish that will eat the larvae. That's what makes this group of ponds critical. But you need a place for them to live outside the pond. And Justice Sotomayor brought up the question about whether the frogs could live in the area outside. You said yes, even though it's far from an ideal place. But Mr. Bishop said there is no showing that frogs could live there. Well, there is some evidence in the record that we point to where the scientists evaluated the land and found some stumps. And there was, as was pointed out, there were frogs located on this up until 1965, even though it was a tree farm going on. But one of the reasons — this hasn't been further developed because this really wasn't the gravamen of the administrative dispute, whether any frog could survive there. And that's why it's not — you know, there isn't more expressed findings about that. The frogs need the ephemeral ponds, and those are there. And there's evidence in the record that there are some stumps. But what about the ground cover and the trees? Is there anything in the record that shows — that could show that the frogs — there could be a sustaining population of frogs there without changes in the tree cover and, therefore, changes in the ground cover? For a long-term sustaining population, there would have to be changes. Now, that — we acknowledge that, and that is what is set here. So they couldn't survive where they are now? I mean, the test can't be, could you — if you dumped a couple of frogs there and then you came back two weeks later or a month later, would any of the frogs still be alive? That can't be the test, right? No, but — They'd have to sustain themselves. Well, they might live for several generations. I mean, I don't know. But I don't think that's the central point here. I think the fact that frogs were identified there up until 1965 and there are stump holes and the basics for this to be a sustained area is really what's important because it shows that it's capable of. Mr. Kneedler, suppose — if we could just go back to Justice Alito's question. Justice Alito suggested that there were other things that the government is capable of doing to conserve these frogs. So what, consistent with Mr. Bishop's view of the statute, could the government do, is the government enabled to do, that would effectively conserve these frogs? Is there anything? It does have the authority — there's a grant program under Section 6 of the Act of grants to states. Now, that would — the grants to the state, the state would have to decide to become involved, and those can involve private conservation groups. The Federal Government could purchase the land if, for example, if the landowner was willing to sell it. So far, there hasn't been any indication that they would be, and the Service understandably very rarely exercises the power of eminent domain. It probably would have the power to do so. But none of that — none of that undercuts the need, the statutory obligation to designate critical habitat. And the statute presumes that the designation of critical habitat is often, almost always, going to be on private land. Isn't that correct? Well — Maybe I'll take down — Not almost always. Often. No. It's often going to be on private land. It often will be on private land, but it's also on public land, and it's important that the Court understand that the limitations that Petitioner would place on the designation of critical habitat would also apply to the government's own land in terms of limiting the Section 7 consultation process if somebody wants a permit on — on Federal land. Can't you do what you want on Federal land? Well, but triggering Section — yes, but — to an extent, but Section 7 is a framework to bring in the Fish and Wildlife Service and its expertise, and for — Well, so the only benefit to the Federal Government is that the Fish and Wildlife Service will sit down at the table with whoever else — whatever other government agency owns the land? Well, I — That is an important benefit. It's not the only benefit. There's a benefit to the public in having Section 7 scrutiny and consultation go on before an action agency undertakes it. At some point, somebody in the Federal Government can say to the Federal Wildlife Service, I want you to sit down with whoever it is, the Army Corps of Engineers, right? You don't need a statute to bring that about. Well, it's true they could, but Section 7 in the ESA organizes that by setting up a consultation process such that the action agency can't go — can't go forward in an area that might harm the species or its habitat without consulting with the agency. That is a very important — Because what I was suggesting was — was — you know, Congress could have passed a statute which just said every time that there's a problem of this kind, the Federal Government has to purchase the land that will support an endangered species. It didn't pass that statute. It passed a statute that said that the Secretary could designate critical habitat regardless whether that habitat was on private or public land. And then the question is, where does this requirement of immediacy come from that Mr. Bishop wants to impose? You mean immediate restoration? You know, that it has to be — that it has to be available to support the species exactly now without any further effort. It is not in the act at all. And the whole concept of conservation is a long-term prospect, not something that has to happen immediately. That's — that's so. Land is around for a long time. We hope the frogs will be, too. You're looking out into the future. Is there anything you want to add in words that I would write if I were writing this opinion that would distinguish the case that Chief Justice first brought up, where the only way to save these frogs, in addition to the ponds, is to build special hothouses in Nome, Alaska? And a decision resting on that, I would strike me as far-fetched. From a situation where all you have to do in addition is drain six inches of If the decision rested on that, even if the owner said, I'll never do it, I would say it was a reasonable decision. Okay. That's highly subjective. Are there any words that you could use that would distinguish those two instances? Well, the greenhouse example is not — is not restoring habitat. I don't — I don't think a greenhouse would — Well, you see what I'm — No, no, no. It's very unlikely. Yes. No, it's very unlikely. But here — here, the restoration efforts are entirely in sync with the use of the land. I mean, there are uplands with trees. As I say, they could be thinned. It's not as if the — not only does the conservation not have to happen immediately, but the — but the restoration doesn't have to happen immediately. So that's your — that's your requirement, that the restoration has to be entirely in — what did you say, in sync or in — In sync with — I'm not saying that that is a hard-and-fast rule. I'm trying to explain why this one — why it is reasonable in this case. My question, and the reason for the hypothetical, is it seems to me that if you permit the designation of something as critical habitat that cannot be occupied by the animal because you think they can do something down the road that will cure the problem, whether it's cut the trees or do anything else, that you ought to be able to articulate what the limit is on what you require down the road. I think it's whether — whether it is a further modification of the habitat in its existing — in its existing state. And at least where the — at least where the habitat is being used in a way that is similar to what would be necessary for its restoration, or would the restoration undermine the fundamental nature of it. So if you get to Justice Gorsuch's or whoever it was, the asphalt thing, if what you have to do is just dig up the asphalt, that's — the use of the area for a parking lot is not in tune with its normal whatever. So you couldn't do that under this statute. Well, I think — I think there may be several factors. The — the effort involved, I mean, if it's one road, that may not be an obstacle. If I could just point out, there is a — there is a statutory place to look for the 1533A1A, which in designating — excuse me, listing a species, it directs the Secretary to take — to determine whether a species may be endangered because of a number of factors. The first one is, quote, the present or threatened destruction, modification or containment of its habitat or range. The reference to modification of habitat suggests that even with modification, it's still habitat, even though it's been modified. And one of the reasons that land is unoccupied by a species is often precisely because of what has happened, people using the land in a way or transforming the land. But this — this passage contrasts destruction of the habitat, which would be the case if there was a parking lot or a building or something that transformed it, and modification of the habitat, which suggests that it retains its essential nature. And here, Unit 1 retains its essential nature, which is these very rare ponds, not only that, a collection of five ponds, which enables the development of a — of a metapopulation. Sotomayor So can we talk about — I see your point with talking about a kind of place, and it does seem logical that the frogs were there, and they were there for a very long time. They were there during the timber cutting, but they left. They left or they were destroyed. So I — what is it about the natural — the native environment that still exists there, and what is it that you think, with very little reasonable effort, that you could change to make it sustaining for a long period of time again? BIDEN What the frog needs is — SOTOMAYOR I know — the PCEs, I know. BIDEN Well, yes, but it — that transformation — or that change, that restoration would not have to happen overnight. It would not mean clear-cutting the loblolly pines and planting — and planting longleaf pines. SOTOMAYOR That's my point. And there is an example in the — in the recovery plan that is cited in the record when it's describing what has happened at Glen Pond, which is the place in Mississippi, the only place where there is a stable population at all. It describes that there has been some habitat management, which has included thinning trees and planting longleaf pines, which suggests this could be a gradual process. They could be cut. They could — some could be cut now to create some open space. You could cut some trees and leave stumps there for the frog. It could be a gradual process that doesn't require that it be instantly made — made available. BIDEN Well, it's still the case that that would require consent to the owners, and they say they're not going to do it. You can't require them to do it, right? But again, what constitutes habitat looks at the nature of the land and whether something is essential. No, you can't require them to do it, but the service looks at it and says if this species is going to be conserved, in fact, if this species is going to survive at all and not be extinct, it is essential to use these pines. It may be that the landowner can ignore that, but it does serve to identify for the landowner and for others that this is critical habitat to the survival of the species. Sotomayor Suppose the missing — Ginsburg Suppose the proposed regulation is in effect. What would the Fish and Wildlife Service have to do differently if the proposed regulation were in effect? BIDEN If the what? The proposed regulation? Ginsburg Yes. BIDEN I think this would qualify under the proposed regulation, as I read it. In fact, it identifies — it says while the landowner's intentions can be taken into account, it's sort of a sliding scale, and the more critical the particular area is for the species, the less likely it is that the intentions of the landowner would be taken into account, and I think that exactly describes this case. This is a rare case because of the rare nature of these ponds. It is critical to preserve these ponds, and they can be used for the habitat of the species. It is the kind of place, because of the ponds, where the species can thrive. BROKAW Let's assume for the moment that this isn't habitat, and therefore couldn't be designated as critical habitat. Could the Secretary take other actions to identify this land as critical to the survival of the species, even if it isn't currently habitat? Is there anything in Section 7 or elsewhere in the statute that would prohibit that? The way I read the statute, it says that, you know, the Secretary has to take actions to avoid jeopardizing the continued existence of any endangered species or result in the destruction of habitat, critical habitat. So there's an oar there, and it seems to me, I wonder, isn't the Secretary fully endowed with authority to take other actions, even if this isn't critical habitat, to identify this land as important to the future survival of the species? WARREN BUFFETT Well, Section 7A.2 is talking about what the Action Agency does to avoid critical habitat, but BROKAW That's the operative action part of the statute. WARREN BUFFETT But Congress enacted it. The concept of habitat has never been a technical term or a technical feature in the way this... BROKAW If you could just answer my question, I'd be grateful. Is there anything that prohibits the Secretary... WARREN BUFFETT Maybe on an ad hoc basis, but it's not under the statute, and the question is, what are the responsibilities... BROKAW My question is, why isn't it under the statute, given that language that says specifically that the agency can take cognizance of the continued existence of any endangered or threatened species quite apart from preserving its threatened habitat? It seems to me there are two duties that the Secretary has there, and this would fit neatly under at least one of them, if not the second. WARREN BUFFETT The Secretary could, but the designation of critical habitat, as I said, it's mandatory under the Act. It has important functions, including identifying the area where actions should be taken because of the likelihood here that the frog will need that space to survive. Again, I suppose the Secretary could do something on an ad hoc basis, but that's not the framework that the statute set up. It's set up with rulemaking, with public transparency, to be based on science, with public input, and identification of costs and weighing of costs. This is an elaborate process, and what the Secretary should do to protect the land and what other agencies should do to protect the land are part of that process. The agency does lots of things to protect species, endangered species, beyond protecting their habitat, doesn't it? WARREN BUFFETT Yes. If there's Federal land involved, other Federal agencies could do it, but the Secretary would have no independent authority with respect to private land except the designation of critical habitat. Roberts. Thank you, counsel. Mr. Bishop, you have four minutes remaining. BISHOP. Justice Gorsuch, to your point, 7A1 imposes an obligation on all other Federal agencies which shall, in consultation with the Secretary, utilize their authorities in furtherance of the purposes of this chapter. Critical habitat is just one part. SOTOMAYOR But that's only if it's designated critical. BISHOP. No. No. No. That is a general obligation. I can tell you that whenever you go for a Clean Water Act permit, it doesn't have to be no critical habitat need be involved. State wildlife agencies and FWS immediately gets involved and has to sign off on those. Critical habitat does not have to be involved. And there's a perfect example in this case. If you read the final designation here, the properties in Mississippi were restored before there was any critical habitat designation. And CBD in its brief says that in doing so, the frog survived in Mississippi through, quote, intense human effort and extensive habitat restoration. That was all done before the critical habitat designation in this case. So the so and just to understand here and to respond to this changes in sink argument that Mr. Needler made, there is nothing in sink about creating an open savanna on our property. This is an intensive 1,500-acre tree farm. The trees are planted 10 to 12 feet apart. There is no ground cover because the sunlight does not reach the forest floor and we don't want it to because that interferes with tending to the trees. It interferes with harvesting them. This is not a property on which there will be any ground cover to supply moisture or food or cover for these frogs. We would have to totally change the way that this land operates in order to accommodate the frog. And the idea that the frog scientists here agree with the government is simply wrong. And I would urge the court to read Lenu and Peckman and Blithove who say, for example, Peckman, one of the scientists, the upland is currently in commercial pine plantations but could be restored to suitable upland habitat. Blithove says that aggressive and proactive management of the uplands will be critical to the survival of the frog. The most important management tool being fire to prevent this from being unsuitable habitat. These scientists all had the same point of view, that this land could be restored through extensive effort to upland frog habitat. Not one of them said that this is currently habitat on what this frog, on which this frog can't survive. The immediacy here, Justice Kagan, comes from the statutory language. It comes from the word habitat in Section 4. It comes from the limitation in 3.5c that the maximum extent of a critical habitat designation is land that can be occupied. It comes from the list in 3.3, where you would certainly have anticipated that if Congress thought that land had to be restored or totally remade in order to be habitat for the frog, that it would have said that rather than using the word maintenance. Maintenance is a word that naturally refers to maintaining what you already have there and improving it, not to completely changing it. And in addition to the powers that I already talked about of the federal agencies having to protect these creatures quite apart from critical habitat designation, there are all sorts of powers operated through the states and the purchase power in Section 5 that allow protection. This is not a choice between the frog surviving and not surviving if it is critical habitat. There are plenty of ways for the government to ensure, as it should, that the frog survives. I'm sorry. I think I read that if these ponds are not designated, that there are no other ponds in the United States. So to the extent that these ponds are not designated critical habitat and don't survive, this frog won't if there's a drought or other conditions in Mississippi. First of all, there are other ways to acquire these ponds. Not one person has talked from the government or from any of the Nature Conservancy or other groups that buy easements on property have talked to any of the owners here. But the second thing is that they don't have to. If it's critical, they can designate it and then an illiterate process goes on where they talk to the owners and you come to an accommodation. That's what generally happens. Could I answer that question briefly? The government has made absolutely clear what it thinks that means. It admits that the most likely outcome here, if we need to apply for permits, is that we get to use 40 percent of the land for development and we have to turn 60 percent of it over for frog habitat. We don't think that that is an appropriate use of our land, given that this is not what we're dealing with. Thank you. Thank you, counsel.